# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fraternal Order of Police Lodge No. 5, : \
by its guardians ad litem, John : \
McNesby, President; Roosevelt Len : \
Poplar, Vice President; John McGrody, : \
Vice President; Steve Weiler, Vice : \
President; Nicholas Denofa, Vice : \
President; Police Officer Sean Cahill; : \
Detective Michael DeRose; Police : \
Officer Richard Green; Police Officer : \
Constance Harris; Police Officer : \
Matthew Nodiff; and Police Officer : \
Anthony Roselli, : \
                Appellants : \
                              :   No. 1295 C.D. 2019 \
               v. : \
                                :   Argued: June 11, 2020 \
The City of Philadelphia, its Officials, : \
Agents, Employees and Assigns; Jim : \
Kenney, in his official capacity as : \
Mayor of the City of Philadelphia; : \
Larry Krasner, in his official capacity : \
as District Attorney of the City of : \
Philadelphia; R. Richard Ross Jr., in : \
his former capacity as Police : \
Commissioner of the City of : \
Philadelphia : \

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge[1] \
                 HONORABLE RENÉE COHN JUBELIRER, Judge \
                 HONORABLE P. KEVIN BROBSON, Judge \
                 HONORABLE PATRICIA A. McCULLOUGH, Judge \
                 HONORABLE MICHAEL H. WOJCIK, Judge \
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge \
                 HONORABLE ELLEN CEISLER, Judge

OPINION BY JUDGE McCULLOUGH           FILED: November 9, 2021

---

[1] This case was assigned to the opinion writer before Judge Brobson succeeded Judge Leavitt as President Judge.

The Fraternal Order of Police Lodge No. 5 (FOP), by its guardians *ad litem*,[2] and six City of Philadelphia Police Officers[3] (collectively, Appellants) appeal from the orders dated August 21, 2019, issued by the Court of Common Pleas of Philadelphia County (trial court), sustaining the preliminary objections (POs) of The City of Philadelphia (City), Jim Kenney, in his official capacity as Mayor, R. Richard Ross, Jr., in his official capacity as (former) Police Commissioner (collectively, "the City"), and Larry Krasner, in his official capacity as District Attorney (DA Krasner or District Attorney), and dismissing Appellants' action for injunctive and declaratory relief with prejudice. We affirm in part and vacate in part the trial court's orders and remand for further proceedings.

## I. Facts and Procedural History

In March 2017, (now former) Philadelphia District Attorney, Seth Williams, created a Police Misconduct Review Committee to identify Philadelphia police officers whose testimony should be avoided in criminal cases. (Second Amended Complaint[4] (Complaint) ¶35, Reproduced Record (R.R.) at 12a-13a.) As a result of the investigation, 66 officers who were accused of committing serious misconduct were placed on a "Do Not Call List,"[5] which was made available to prosecutors who used it to identify which officers not to call during trial. *Id.* ¶36;

---

[2] They are John McNesby, President; Roosevelt Len Poplar, Vice President; John McGrody, Vice President; Steve Weiler, Vice President; and Nicholas Denofa, Vice President.

[3] They are Police Officer Sean Cahill; Detective Michael DeRose; Police Officer Richard Green; Police Officer Constance Harris; Police Officer Matthew Nodiff; and Police Officer Anthony Rosseli.

[4] The original complaint was amended twice after preliminary objections, with the Second Amended Complaint being the operative complaint for purposes of this appeal. For ease of reference, we will refer to it as the "complaint."

[5] Also referred to as "List."

R.R. at 13a.  This List "of Philadelphia's 66 problem cops" was published in a Philadelphia newspaper on March 16, 2018.  The newspaper included information about on-duty and off-duty misconduct contained in the officers' personnel files.[6] *Id.* ¶¶51-52; R.R. at 16a.

## Complaint

DA Krasner took office in November 2017.  On November 13, 2018, Appellants filed the instant action alleging that the District Attorney was actively compiling materials from the personnel files of police officers obtained from the Police Commissioner[7] concerning allegations of purported police officer misconduct – even in which the police officer was exonerated by an administrative or other judicial or quasi-judicial body – in order to compile a new, updated "Do Not Call List."[8] *Id.* ¶¶53-54; R.R. at 16a-17a, 194a.  In an article published in a Philadelphia newspaper on June 4, 2018, and attached to the complaint as Exhibit "H," it was reported that DA Krasner was "seeking to develop a comprehensive list of tainted cops" and that he recently stated in an interview that the number of officers who will

---

[6] On March 16, 2018, *The Philadelphia Inquirer* published a list stating for each of the 66 officers: his/her name; his/her rank; date of misconduct (on and off-duty); summary of facts; PBI (Police Board of Inquiry) Finding/Arrest; Penalty; Disclosure; and Limit on Testimony.  This 18-page roster placed the officers into three categories to provide guidance for prosecutors: "Do Not Call" as a witness in court unless approved by a high-ranking district attorney; "May use" as a witness but first inform the defense attorney of the officer's alleged misconduct; and "Use without restriction" but be aware of the noted misconduct.  https://www.inquirer.com/crime/inq/full-list-philadelphias-66-problem-cops-20180316.html#textjump (last visited November 4, 2021).

[7] The Police Commissioner is the head of the Philadelphia Police Department.  His authority extends to the retention, protection, and access to confidential personnel information of all police officers under his command.  (Complaint, ¶28; R.R. at 11a.)

[8] Appellants clarified that the term "Do Not Call List" as used in the complaint refers to "the method by which the District Attorney obtains, reviews and stores confidential personnel information of police officers . . . and the compilation, tabulation, record-keeping, use of data bases, or any other methods employed to compile and keep track of those Police Officers." (Complaint, at 3-4, n.1; R.R. at 3a-4a.)

ultimately "end up on the roster would almost certainly exceed the 66 on a similar list developed by his predecessor."[9]  In that article, DA Krasner was also quoted as saying he was "compiling a database of infractions" that will help identify those officers who are "too questionable to testify."  *Id.*  The complaint alleges that DA Krasner had openly voiced his frustration with FOP's history of defending police officers who had been punished by the City.  The complaint alleges that DA Krasner publicly claimed that the Police Commissioner "has almost no capacity to discipline, terminate, or even move [officers] to another unit because everything is overturned in the corrupt arbitration process."  *Id.* ¶50; R.R. at 16a (emphasis removed) (quoting from an article in *The New Yorker Magazine*, Complaint Exhibit "G;" R.R. at 189a).

It is averred that, by its terms and as applied, the new Do Not Call List impermissibly mandates disclosure of police officers' confidential personnel information to the District Attorney and then to third parties when the officer is charged with a violation of a Philadelphia Police Department (PPD) policy or procedure, but is later exonerated, by the Police Board of Inquiry (PBI), PPD's Internal Affairs Division (IAD), a labor arbitrator, or a court.  *Id.* ¶101; R.R. at 27a.

The complaint alleges that the appellant police officers were not informed that they were being investigated or considered for the new Do Not Call List; they were only informed after they were placed on the List by the following form letter (Letter(s)):

> The [District Attorney's Office] **has received** *Giglio* [*v. United States,* 405 U.S. 150 (1972)] information regarding you as reflected in the summary below:
>
> Date:
> Source:

[9] *See* https://www2.philly.com/philly/news/crime/philly-da-krasner-seeking-to-develop-comprehensive-list-of-tainted-cops-20180604.html  (last visited November 4, 2021).

Summary:

Action:

Pursuant to the law and the [District Attorney's Office's] policy regarding police misconduct disclosures, the misconduct *will be disclosed to the defense* in all cases where you may be called to testify as a witness and said disclosure may also be made if required in closed cases where you were a critical witness.

Also, if required by law, supporting documentation in our possession regarding the misconduct will be disclosed to the defense.

*Please note, if you believe our information is incorrect, feel free to communicate to us in writing through counsel.*

*Id.* ¶¶61-65, 98; Complaint Exhibit "R"; R.R. at 18a-19a, 25a-26a, 231a. (Emphasis added.)

The complaint alleges that once placed on the Do Not Call List, police officers have lost opportunities to testify in criminal cases in which they served as investigator, and sometimes were subject to transfer to other departments or delegated to restrictive duty status. *Id.* ¶¶78, 90-91; R.R. at 21a, 24a. The complaint further alleges that for these officers, critical parts of police work were restricted, resulting in lost wages, reputational damage, and professional harm. *Id.* The complaint also alleges that the appellant police officers were not removed from the Do Not Call List even after the allegations of misconduct were determined to be unfounded or lacking in merit. *Id.* at 5; R.R. at 5a.

The complaint avers that the appellant police officers were not informed that they were placed on the Do Not Call List until after the fact, nor were they provided an opportunity to challenge their inclusion on the List prior to or after

5

being placed on the List.  Appellants allege that the District Attorney, with assistance from the City, is engaging in the "wholesale release of confidential personnel information to third parties without an opportunity to be heard to challenge the legal necessity of such release" and that such disclosure has had a "direct and negative impact" on the appellant police officers' reputations amongst their colleagues and the public, as well as their work assignments and promotional opportunities, and constitutes violations of their statutory and constitutional rights.  *Id.* at 5-6; R.R. at 5a-6a.  The complaint alleges that public disclosure of the new List, as ultimately occurred with the prior List, has and will result in reputational harm to the appellant police officers.  *Id.* ¶83; R.R. at 22a.

For each named appellant police officer, the complaint summarizes the allegations of misconduct, the contents of the Letter he/she received, that each officer was exonerated of the charges (acquittal by federal grand jury, exoneration before PBI),[10] that each officer was not afforded an opportunity to challenge inclusion on the List prior to or after being placed on it, and how each officer was harmed either by the violation of his/her statutory and constitutional rights or the loss of assignments, overtime, promotional considerations.  *Id.* ¶¶102-203; R.R. at 27a-45a.

The complaint consists of seven counts and requests injunctive and declaratory relief.

_____

[10] The charges against two officers, Sergeant Reed and Sergeant Stephan, were still pending at the time the complaint was filed.  (Complaint ¶169; R.R. at 39a-40a.)

**Counts I and II - Violation of Due Process with Respect
to Officers' Right to Reputation under Pennsylvania
Constitution – Equitable and Declaratory Relief**

In Counts I and II, it is averred that article I, sections 1, 11, and 26 of the Pennsylvania Constitution recognize a fundamental right to privacy that protects one's reputation. Pa. Const. art. I, §§1, 11, 26.[11] Appellants allege that the creation of the Do Not Call List and the disclosure of appellant police officers' confidential personnel information to DA Krasner and criminal defense counsel without notice and an opportunity to be heard constitutes a deprivation of fundamental rights enshrined in the Pennsylvania Constitution. (Complaint, ¶213; R.R. at 47a.) Appellants aver that officers are only notified after their confidential personnel information has been disclosed to the District Attorney. *Id*. ¶216; R.R. at 47a. Appellants aver that, although police officers' counsel are invited to communicate to the District Attorney's Office if the officer believes the information is "incorrect," the District Attorney retains sole discretion to decide whether to keep the officer on the List. Appellants submit that there is no procedure in place for officers, who have been exonerated, to seek removal from the List. They contend that the inability to challenge their placement on the List has deprived them of their fundamental rights to reputation without due process. Appellants charge the District Attorney and the City with failing to provide the requisite constitutionally necessary due process protections before placing the officers indefinitely on the Do Not Call List and not providing them an opportunity to argue before an impartial tribunal why they should be removed from the List before their confidential personnel information is disclosed to third parties. *Id*. ¶¶214-18; R.R. at 47a-48a.

Appellants seek equitable relief in the form of an injunction against the City and DA Krasner from creating or employing the new, updated, and revised Do

---

[11] These constitutional provisions are set forth *infra*.

Not Call List, or disclosing the officers' confidential personnel information unless and until a court orders such disclosure and/or adequate due process protections are established on behalf of appellant police officers. *Id*. ¶¶219-20; R.R. at 48a.

**Counts III and IV** - **Violation of Due Process with Respect to Police Officers' Statutorily Mandated Contractual Rights under Pennsylvania Constitution – Equitable and Declaratory Relief**

In Counts III and IV, Appellants assert that, by creating and employing the new Do Not Call List and disclosing confidential personnel information, the District Attorney deprived appellant police officers of their fundamental constitutional right to contract and the contractual guarantees of their statutorily mandated collective bargaining agreement (CBA). Appellants aver that the Pennsylvania Constitution, article I, sections 1, 11, and 26 require adequate protections with respect to fundamental rights, including the right to contract. *Id.* ¶226, R.R. at 50a. Appellants contend that Act 111[12] statutorily mandates a process by which uniformed public employees, such as police officers, may organize and bargain collectively for their terms and conditions of employment. *Id.* ¶227; R.R. at 50a-51a. Act 111 requires interest arbitration to resolve disputes over the terms and conditions of employment. *Id.* Appellants aver that through Act 111 procedures, the City and FOP bargained and agreed on the terms of employment, discipline, discharge, work assignments, transfers, promotions, and other terms and conditions of employment. *Id.* ¶228; R.R. at 51a. Appellants maintain that the District Attorney, through creating and employing the Do Not Call List and publicly disclosing the appellant police officers' confidential personnel information, deprived the officers of their constitutional and statutorily mandated contract rights without due process. *Id.* ¶¶229-30; R.R. at 51a. Appellants allege that officers charged with

---

[12] Act of June 24, 1968, P.L. 231, No. 111, *as amended*, 43 P.S. §§217.1-217.10.

8

misconduct, ***but who are later exonerated***, were effectively "disciplined" by the District Attorney because they lost overtime, and promotional and assignment opportunities through placement on the Do Not Call List. *Id.* ¶¶232-35; R.R. at 51a-52a. According to Appellants, these deprivations of statutorily mandated collective bargaining rights occurred without any due process guarantees in violation of the Pennsylvania Constitution. *Id.* ¶236; R.R. at 52a.

### Counts V and VI - Tortious Interference with Existing CBA – Equitable and Declaratory Relief

In Counts V and VI, Appellants assert that the District Attorney has publicly demonstrated his "displeasure and disgust" with the disciplinary procedures under the CBA and he has engaged in purposeful conduct intended to harm the existing contractual relationship between the City and FOP. *Id.* ¶¶246-47; R.R. at 55a. Appellants assert that the District Attorney's creation of the new List and his disclosure of confidential personnel information of police officers who have been exonerated shows a blatant disregard for the due process procedures existing under the CBA in handling misconduct of police officers. *Id.* ¶248; R.R. at 55a. Appellants claim that neither *Brady v. Maryland*, 373 U.S. 83 (1963), nor *Giglio*, justify or authorize the District Attorney to disregard the conclusions of the PBI, an arbitrator, or a court of law, which exonerated a police officer of alleged misconduct and place him/her on a Do Not Call List and disclose his/her confidential personnel information to third parties. *Id.* ¶251; R.R. at 56a. Appellants allege that by placing the appellant police officers on the List and leaving them on the List despite the fact that the charges against them were determined to be unfounded, the District Attorney has undermined the contractual provisions of the CBA by creating alternative, extra-contractual disciplinary procedures which go beyond that upon which was agreed. *Id.* ¶¶249-50; R.R. at 55a-56a. Appellants contend that the officers have been

harmed by a violation of their constitutional rights to contract, due process, and reputation. *Id*. ¶252; R.R. at 56a.

### Count VII - Violation of the Pennsylvania<br>Right-to-Know Law – Equitable Relief

In Count VII, Appellants assert that the District Attorney and City are not complying with the mandates of the Right-to-Know Law (RTKL)[13] and due process clause of the Pennsylvania Constitution by requesting and releasing police officers' confidential personnel information without providing the officers the opportunity to challenge the release of such information before it is disclosed. *Id.* ¶¶276-79; R.R. at 60a-61a.

### Relief Sought

Appellants request equitable relief in the form of a permanent injunction enjoining the District Attorney from creating and maintaining a Do Not Call List that includes officers who have been exonerated of wrongdoing or disclosing any police officers' confidential personnel information to any third parties unless and until a court orders such disclosure and/or adequate due process protections are established on behalf of the officers. Appellants request a declaratory judgment that the District Attorney and the City have violated the police officers' due process rights by failing to afford adequate procedural protections with respect to the officers' fundamental rights to privacy and reputation.

---

[13] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101-67.3104.

## Trial Court's Order Sustaining POs
## and Dismissing the Complaint

The City and the District Attorney each filed POs in the nature of a demurrer, challenging the legal sufficiency of the complaint under Pa.R.Civ.P. 1028(a)(4).

The City argued, *inter alia*,[14] that the due process claims must be dismissed because under the Supremacy Clause of the United States (U.S.) Constitution,[15] the police officers' state constitutional guarantee of rights to reputation cannot override the rights guaranteed to criminal defendants under the U.S. Constitution.

For his part, the District Attorney argued, *inter alia*, that the claims against him lack merit because: (1) the harm alleged was only hypothetical and speculative, and, therefore, Appellants' claims do not constitute a case or controversy; (2) *Brady* and *Giglio* bar Appellants' claims; (3) the procedural due process claims with respect to the appellant police officers' fundamental right to reputation fail to state valid claims; and (4) injunctive relief to compel affirmative action is not available against a district attorney acting in his official capacity.

On August 21, 2019, the trial court entered separate orders, sustaining the POs filed by the City and the District Attorney and dismissing the complaint with prejudice. The trial court issued its Pa.R.A.P. (Rule) 1925(a) opinion on November 18, 2019. The trial court based its dismissal of the complaint against the District

---

[14] The City and the District Attorney raised other POs to Counts III through VII (lack of jurisdiction, failure to state a claim under the RTKL, and failure to state a claim for tortious interference with contract and others) that were not addressed by the trial court. The trial court's decision not to consider these POs makes it inappropriate for us to address them in the first instance. *Whittington v. Episcopal Hospital*, 768 A.2d 1144, 1156 (Pa. Super. 2001) ("[U]nless and until the coverage issue is decided by a trial court it is not appropriate for our review.").

[15] U.S. Const. art. VI.

11

Attorney on four grounds. First, it held that the actions alleged in the complaint are well within the District Attorney's capacity as prosecutor. The trial court held that under *Brady*, and *Giglio*, and under Rule 573(B)(1)(a) of the Pennsylvania Rules of Criminal Procedure (Pa.R.Crim.P. 573(B)(1)(a)), the District Attorney is obligated to disclose any exculpatory and impeachment evidence to criminal defense counsel, including evidence that bears on a witness's credibility. (Trial ct. op., 11/18/19, at 4-6.)

Next, the trial court held that Appellants failed to establish that a Do Not Call List exists because (1) "contrary to [Appellants'] assertions," the Letters attached to the complaint "do not indicate that a Do Not Call List exists or will exist in any point in the future"; (2) Appellants "ha[ve] not produced any evidence that [the District Attorney] keeps or maintains a Do Not Call List, as alleged"; and (3) "[a]t this time [Appellants have] produced no evidence in any of [the] [c]omplaints to corroborate the speculatory existence of a Do Not Call List." *Id*. at 6-8.

Third, the trial court held that the District Attorney has "absolute immunity" from liability "for civil damages for actions relating to prosecution of a criminal case." *Id*. at 6, 8.

Lastly, the trial court found that the complaint was "hypothetical and speculative in nature" because "no action has yet been taken that would infringe on [the appellant officers'] rights." *Id*. at 7. The trial court reasoned that appellant police officers received Letters informing them that "instances of misconduct that could ***potentially*** fall under the definition of exculpatory evidence, because they concern witness credibility [and] ***may*** be disclosed in some future case." *Id.* (emphasis in original). Focusing on the content of the Letters, the trial court emphasized that they "do not indicate that [the District Attorney] ultimately will make any of the misconduct evidence public." *Id*. The trial court further noted that

12

the Letters "do not indicate" that the officers "will be transferred to other departments or delegated to restrictive duty status." *Id.*

With respect to the claims against the City, the trial court found that they were "trumped by the Due Process Clause of the Fourteenth Amendment[,U.S. Const. amend. XIV,] and its progeny under *Brady* and *Giglio*" and that, therefore, it could not prohibit the City from "providing potential impeachment evidence to the District Attorney when requested." *Id.* at 9.

## II. Appeal and Issues

On appeal, Appellants raise four issues:

1. Did the trial court err in dismissing the complaint on the grounds that Appellants produced no evidence in the complaint to corroborate the existence of a Do Not Call List or that the District Attorney maintains such a List?

2. Did the trial court err in dismissing the complaint on the grounds that *Brady* and *Giglio* authorize the actions of the City and the District Attorney, as alleged in the complaint?

3. Did the trial court err in dismissing the complaint on the grounds that the District Attorney has absolute immunity from the claims and relief sought against him?

4. Did the trial court err in dismissing the complaint on the grounds that the harms alleged by the appellant police officers in the complaint were only hypothetical and speculative in nature?

(Appellants' Br. at 6.)

## III. Analysis

It is well established that in reviewing a trial court's grant of preliminary objections, this Court must "determine whether the trial court committed an error of law," and in doing so, must "apply the same standard as the trial court."

13

*Hahn v. Community Health Care Systems, Inc.*, 14 A.3d 120, 124 (Pa. Super. 2011). Where, as here, a defendant files preliminary objections to a plaintiff's complaint in the nature of a demurrer, *see* Pa.R.Civ.P. 1028(a)(4), the court's review is confined to the content of the complaint and any attachments thereto. *Thomas v. Corbett*, 90 A.3d 789 (Pa. Cmwlth. 2014). Thus, the court may determine only whether, on the basis of the plaintiff's allegations, he or she possesses a cause of action recognized at law. *Id.* The court may not consider the factual merits of the claims. *Schmidt v. Deutsch Larrimore Farnish & Anderson, LLP*, 876 A.2d 1044, 1046 (Pa. Super. 2005). Rather, the court "must accept as true all well-pleaded material allegations in the [complaint], as well as all inferences reasonably deduced therefrom." *GTECH Corporation v. Commonwealth*, 965 A.2d 1276, 1285 (Pa. Cmwlth. 2008) (*citing Stanton-Negley Drug Co. v. Department of Public Welfare*, 927 A.2d 671, 673 (Pa. Cmwlth. 2007)). The court need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. *Id.* This Court may only affirm the lower court's grant of preliminary objections if it appears "with certainty that the law will not permit recovery, and any doubt should be resolved by a refusal to sustain them." *Id.*

Importantly, documents attached as exhibits, documents referenced in the complaint, as well as facts already of record may also be considered. *See Jenkins v. County of Schuylkill*, 658 A.2d 380, 383 (Pa. Super. 1995).

### Did the Trial Court Err When it Dismissed the Complaint on the Grounds that Appellants Produced No Evidence that the District Attorney Keeps or Maintains a Do Not Call List?

Appellants argue that the trial court erred by dismissing the complaint on the grounds that Appellants failed to "produce evidence" that the District Attorney keeps or maintains a Do Not Call List. Appellants assert that they were

not required to identify or point to evidence in the complaint to corroborate the existence of the Do Not Call List. We agree.

Pennsylvania is a fact-pleading jurisdiction; as such, a complaint must provide notice of the nature of the plaintiff's claims and also summarize the facts upon which the claims are based. *Youndt v. First National Bank of Port Allegany*, 868 A.2d 539, 544 (Pa. Super. 2005). Pennsylvania Rule of Civil Procedure 1019(a) and (b) encapsulates this theory. Rule 1019(a) provides that in pleadings, "[t]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form[.]" Pa.R.Civ.P. 1019(a). Rule 1019(b) requires that "[a]verments of fraud or mistake shall be averred with particularity. Malice, intent, knowledge, and other conditions of mind may be averred generally." Pa.R.Civ.P. 1019(b). The purpose of these rules is to require the pleader to disclose material facts sufficient to notify the adverse party of the claims it will have to defend against. *Martin v. Lancaster Battery Co., Inc.*, 606 A.2d 444, 448 (Pa. 1992); *Landau v. Western Pennsylvania National Bank*, 282 A.2d 335, 339 (Pa. 1971).

There is no requirement that the plaintiff "produce" or "plead" the evidence or proof upon which the pleader will rely to establish those facts. *Commonwealth by Shapiro v. Golden Gate National Senior Care, LLC*, 194 A.3d 1010, 1029-30 (Pa. 2018); *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983) (holding the plaintiff need only plead ultimate facts; evidentiary facts need not be set forth in the complaint); *United Refrigerator Co. v. Applebaum*, 189 A.2d 253, 255 (Pa. 1963); *Unified Sportsmen of Pennsylvania v. Pennsylvania Game Commission*, 950 A.2d 1120, 1134 (Pa. Cmwlth. 2008) (holding that to be sufficiently specific, "the complaint need not cite evidence but only those facts necessary for the defendant to prepare a defense").

15

The trial court was required to accept as true all well-pleaded averments in the complaint. In sustaining the POs, the trial court was not convinced by the averments of the complaint that a Do Not Call List actually exists. In so doing, it effectively made a factual finding, *i.e.*, there is no List. In ruling on preliminary objections, however, the trial court may not consider the factual merits of the claims – which is precisely what the trial court did here. As explained, the trial court need only consider whether Appellants satisfactorily **pleaded** the existence of a Do Not Call List. Thus, the trial court's criticism that Appellants proffered insufficient "evidence" of a Do Not Call List was premature and an erroneous basis upon which to sustain a demurrer.

Our review of the complaint confirms that Appellants sufficiently averred that there is a new Do Not Call List maintained by the District Attorney, which is continuously updated and contains the names and confidential personnel information of the appellant police officers who have been exonerated of charges of misconduct. (Complaint, ¶¶54-64; R.R. at 17a-19a.) Appellants averred that FOP learned on or about May 15, 2018, that the District Attorney was creating a new, updated, revised, and more expansive "Do Not Call List" as well as a process by which police officers were placed on the List. *Id*. ¶54; R.R. at 17a. Appellants specified that references to the Do Not Call List in the complaint were not limited to a concrete or tangible List *per se* but included "the method by which [the District Attorney] obtains, reviews and stores confidential personnel information of police officers . . . and the compilation, tabulation, record-keeping, use of data bases, or any other methods employed to compile and keep track of those [p]olice [o]fficers." (Complaint, at 3-4, n.1; R.R. at 4a.) Appellants attached magazine and newspaper articles to the complaint, quoting the District Attorney's statements that there is a List, that he was in the process of compiling a new updated database of infractions

and that the new "roster" would include more police officers than the previous Do Not Call List. These were well-pleaded allegations.

Because the trial court prematurely required evidence of a Do Not Call List rather than accepting the well-pleaded allegations of the complaint as true, we must conclude that the trial court's basis for sustaining the POs on this ground was error.

### Did the Trial Court Err in Dismissing the Complaint on the Grounds that *Brady and Giglio* Authorized the District Attorney and the City's Actions?

Next, the trial court dismissed the complaint based on its conclusion that *Brady*, *Giglio*, and Pa.R.Crim.P. 573(B)(1)(a)[16] authorize the City to release the police officers' personnel information to DA Krasner and because DA Krasner is authorized under *Brady* and *Giglio* to engage in all of the conduct alleged in the complaint. The trial court concluded that such action is fully within the discretion of DA Krasner as he is tasked with carrying out his responsibilities to fairly prosecute crimes and maintain the integrity of the criminal justice system.[17]

---

[16] Pa. R.Crim.P. 573(B)(1)(a) provides:

> **(B) Disclosure by the Commonwealth.**
> (1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
> > (a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth[.]

Pa.R.Crim.P. 573(B)(1)(a) (emphasis in original).

[17] The Dissent argues that an "accusation" of misconduct, even if it has deemed to be unfounded, goes to the heart of a PPD employee's trustworthiness and speaks to whether they have

**(Footnote continued on next page…)**

At the outset, we agree with the trial court that DA Krasner and the City have an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates [a defendant's Fourteenth Amendment] due process [rights] where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. *Brady* material must be turned over regardless of whether the defense makes a request. *United States v. Agurs*, 427 U.S. 97, 111-12 (1976). The obligation extends to evidence in the possession of the entire prosecutorial team, "including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (imposing on a prosecutor the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Commonwealth v. Burke*, 781 A.2d 1136, 1142 (Pa. 2001) (holding that under *Kyles*, "the prosecution's *Brady* obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution"). *Brady* material also includes impeachment material, *i.e.*, evidence of dishonest acts, bias, motive, and any other evidence tending to affect witness credibility. *Giglio*, 405 U.S. at 153-55.

conducted himself/herself with fidelity and honor in fulfilling the inherently weighty duties of his/her job. *Fraternal Order of Police, Lodge No. 5 v. The City of Philadelphia*, ___ A.3d ___, ___ (Pa. Cmwlth., No. 1295 C.D. 2019, filed ____) (Ceisler, J., dissenting) slip op. at 5. We disagree with that conclusion. One of the most fundamental tenets and principles of our justice system is that people are presumed innocent until proven guilty. Thus, an accusation is actually consistent with innocence; it does not establish guilt. This principle has been applied in the context of allegations of police officer misconduct and the *Brady* rule. *See Dicks v. United States* (W.D. Pa., No. 09-2614, filed Sept. 8, 2010), 2010 WL 11484356 (holding that police officer internal affairs investigation and civil lawsuits never resulted in any finding of misconduct; thus, the allegations were not favorable to the petitioner under *Brady*); *United States v. Booker* (E.D. Pa., No. 95-211, filed Apr. 24, 1997), 1997 WL 214850, slip op. at *2-3 (finding that the probative value of the "evidence of prior unfounded or unsubstantiated allegations" is limited "and would be substantially outweighed by the risk of unfair prejudice").

Unquestionably, the District Attorney has an affirmative duty to disclose potentially exculpatory evidence, as well as evidence that could be used to impeach prosecution witnesses, whether that evidence is in the possession of the Office of the District Attorney or the City itself and must provide that evidence to the accused. *Kyles*, 514 U.S. at 437-39. Furthermore, the City has a derivative duty to assist the District Attorney with fulfilling his constitutional obligation to criminal defendants, by providing the District Attorney, at his request, with information regarding such allegations. *Id.*

Accordingly, we conclude the trial court properly dismissed Appellants' complaint to the extent that it seeks to enjoin the City from providing information from appellant officers' personnel files to DA Krasner, and to enjoin DA Krasner from creating and maintaining an internal Do Not Call List, or from disclosing potentially exculpatory or impeachment information to criminal defense counsel.[18]

However, with that said, this does not end our inquiry. Appellants do not only challenge the City's disclosure of the appellant police officers' confidential personnel information to DA Krasner, or his right to request it from the City or disclose it to criminal defense counsel. The complaint also raises a constitutional procedural due process claim on behalf of exonerated officers who do not believe they should be on the List in the first place. Appellants seek to enjoin DA Krasner from maintaining or releasing a Do Not Call List that includes their names unless and until they are provided with an opportunity to demonstrate why, having been

---

[18] Of course, determinations regarding the **admissibility** of such evidence at trial will require a separate analysis, which will ultimately be made by the trial judge in each individual case, in line with the Pennsylvania Rules of Evidence. *Commonwealth v. Hawk*, 709 A.2d 373, 376 (Pa. 1998). *See also Commonwealth v. Green*, 640 A.2d 1242, 1246 (Pa. 1994) ("[I]t is clear that the holding in *Brady* . . . in no way mandates that the evidence first be admissible before it can be deemed 'material' to the defense.").

exonerated, they should not be on the List. Appellant police officers aver that the opprobrium associated with being on a Do Not Call List directly interferes with their constitutional rights to protect their reputations. They argue that their reputations will, in fact, be infringed if they are added to a publicized blacklist, without being given a meaningful opportunity to challenge their designation as such before an impartial tribunal. The complaint avers that there is no mechanism for an officer, who is found not guilty of the misconduct charges, to do so.

The trial court did not find merit in the appellant police officers' argument because it found that the City's and the DA's constitutional duties under *Brady* and *Giglio* preempt or supersede the officers' claimed reputation and privacy rights. We do not agree that this is the case.

First, the due process right asserted by the officers relates to the impropriety of **being placed on** the Do Not Call List. Second, neither *Brady* nor *Giglio* eliminate the right of innocent officers to be afforded a meaningful opportunity to argue why they should not be placed on the List or why they should be removed prior to any public disclosure of the List. Whether the appellant police officers, who have been exonerated of misconduct charges, must be given the opportunity to argue why they should not be on the Do Not Call List before it is disclosed to the public involves an inquiry, which is separate from the District Attorney's duty to disclose potentially exculpatory and impeachment information under *Brady* and *Giglio*. An officer may be afforded due process to argue why he should not be on the Do Not Call List without violating *Brady*.

Thus, we conclude it was error for the trial court to dismiss the entire complaint on the grounds that *Brady* and *Giglio* authorize the City's and District Attorney's actions. Appellants have raised a separate due process claim, which is not preempted or superseded by *Brady* and *Giglio* and must be analyzed separately.

20

**Due Process**

In Counts I and II, Appellants seek to enjoin the dissemination of the Do Not Call List before the officers have the chance to demonstrate why, having been exonerated of misconduct, they should not be on the List.

The government is prohibited from depriving individuals of life, liberty, or property, unless it provides the process that is due. *Commonwealth v. Turner*, 80 A.3d 754, 764 (Pa. 2013). The basic elements of procedural due process are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. *Id.* A due process claim requires a two-part analysis: (1) whether there is a life, liberty, or property interest with which the state has interfered; and (2) whether the procedures attendant to that deprivation were constitutionally sufficient. *Id.*

Appellants argue that the appellant police officers were mistakenly or unfairly placed on the Do Not Call List because the allegations of misconduct were deemed unfounded. They contend that their placement on the Do Not Call List interfered with their protected liberty interest in their professional and personal reputations. They aver that the District Attorney and the City violated their constitutional rights to reputation without proper process because they were denied the opportunity to argue why, having been cleared of any wrongdoing, they do not deserve to be on the List. *See* Complaint, ¶¶74, 82-83; R.R. at 22a.

The Pennsylvania Constitution establishes the right to protect one's reputation as one of the fundamental rights that cannot be abridged without compliance with state constitutional standards of due process and equal protection. Article I, section 1 of the Pennsylvania Constitution provides:

> All men are born equally free and independent, and have
> certain inherent and indefeasible rights, among which are

21

those of enjoying and defending life and liberty, of acquiring, possessing and ***protecting*** property and ***reputation***, and of pursuing their own happiness.

Pa. Const. art. I, §1 (emphasis added). Article I, section 11 of the Pennsylvania Constitution provides:

> ***All courts shall be open***; and every man ***for an injury done*** him ***in*** his lands, goods, person or ***reputation*** shall have remedy by due course of law and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. art. I, §11 (emphasis added). Article I, section 26 of the Pennsylvania Constitution provides:

> Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

Pa. Const. art. I, §26.

These provisions, taken together, establish a legally cognizable protection against governmental infringement of reputation without due process. *R. v. Department of Public Welfare*, 636 A.2d 142 (Pa. 1994); *Pennsylvania Bar Association v. Commonwealth Insurance Department*, 607 A.2d 850 (Pa. Cmwlth. 1992). Due process entitles an individual to adequate notice of the charges against him and an opportunity to be heard. *Dunn v. Department of Transportation, Bureau of Driver Licensing*, 819 A.2d 189 (Pa. Cmwlth. 2003).

In *Simon v. Commonwealth*, 659 A.2d 631 (Pa. Cmwlth. 1995), the former Pennsylvania Crime Commission published a report entitled "Racketeering and Organized Crime in the Bingo Industry." *Id*. at 634. In the report, the Commission named the petitioners as being involved in the operation of bingo games and being connected to organized crime figures. *Id*. Prior the publication of the

22

report, the petitioners were not afforded notice that their names would be included in the report and tied to organized crime figures, or an opportunity to be heard. *Id.*

The petitioners filed an action against the Commonwealth in this Court's original jurisdiction, seeking injunctive and declaratory relief, contending that they could not be deprived of their state constitutional right to possess and protect their reputations without being afforded due process. *Id.* at 633. The petitioners argued that due process required notice and a meaningful opportunity to hear the Commonwealth's evidence of criminal connections or activity and to be heard on the issue.

This Court held that an individual's reputation is fundamental under the Pennsylvania Constitution and cannot be abridged without compliance with both due process and equal protection requirements. *Id.* at 637. We observed that "[u]nder this scheme, there is no forum for an individual who believes that his reputation has been adversely affected to seek a remedy until after the possible damage has been done. This is clearly an unconscionable abrogation of a state protected constitutional right without due process." *Id.* at 639. Emphasizing that advanced notice is the most basic of all requirements, we held that publication of the report without giving the petitioners notice that their reputations were at issue and to provide them an opportunity to present objections was in violation of article I, sections 1 and 11 of the Pennsylvania Constitution. *Id.* at 638-39.

In *Pennsylvania Bar Association*, this Court held that before an attorney's name could be placed on a suspected fraud list because his/her client was suspected of fraud, the Commonwealth was required to give the attorney notice and an opportunity to be heard. There, section 1822 of the Vehicle Code, 75 Pa.C.S. §1822, created an index of suspected fraudulent automobile insurance claims. As part of the index, the names of the attorneys representing the suspected fraudulent

23

claims were included in the index. 607 A.2d at 854. The Pennsylvania Bar Association (PBA) challenged the constitutionality of section 1822, contending that the inclusion of its members' names in the index without notice and an opportunity to be heard was an unconstitutional harm to their reputations. In response, the Commonwealth argued that the index was not publicly disclosed but was only published to insurers and several other categories of individuals. This Court rejected that argument, explaining that the limited audience which had access to the names on the index did not lessen harm to the members' reputation:

> The fact that the reports are only accessible to member-insurers and several other categories of individuals does not make them any less damaging, ***as the attorney must deal with these insurers in the course of his business, and his reputation in their eyes is at least as valuable as it is in the eyes of the general public, if not more so***. Consequently, we find merit in PBA's allegation that section 1822's requirement that member insurers report the names of attorneys involved in the "suspected fraudulent claims" inevitably leads to the injury of these attorneys' reputations, based upon suspicion alone.

*Id.* at 854 (emphasis added).

Here, the complaint avers that the original List of "rogue" or "tainted" police officers was published in *The Philadelphia Inquirer*. (Complaint, ¶37.) As alleged in the complaint, it is a blacklist of sorts. If, as Appellants allege in the complaint, a new updated List is being compiled, then it is not unreasonable for the appellant officers to be concerned that the new List will meet the same fate as the first List. It will be requested by the media and made public. There can be little question that placement on a formal list of officers who are deemed untrustworthy or unworthy of the privilege of testifying in support of a prosecution could very well be detrimental to their reputations in the community and in the employment context

24

if released.  The appellant police officers must deal with other officers, their superiors, district attorneys, defense counsel, and the public during the course of their employment.  This is especially so when the allegations against the officers are deemed to be unfounded.  As explained in an article in the Stanford Law Review:

> [T]he *Brady*-cop designation immediately puts a question mark on the officer's ability to testify, and that question mark has severe employment consequences.  An officer who cannot be counted on to testify also cannot be counted on to make arrests, investigate cases, or carry out any other police functions that might lead to the witness stand.  *Brady* cops may thus find themselves fast-tracked for termination and hard-pressed to find future work.
>
> Considering the grave employment consequences, one might expect strong substantive and procedural protections to guard against mistakenly or unfairly placing an officer on the *Brady* list.  But that is not the case.  Unlike in police department disciplinary proceedings, which provide many procedural protections to accused officers, prosecutors can make *Brady*-cop designations based on flimsy evidence and without giving officers an opportunity to contest the allegations beforehand or to appeal the decisions afterward. Even if, on appeal, the officer overturns the misconduct finding that landed him on the *Brady* list, the prosecutor can continue to label the officer as a *Brady* cop if he doubts the officer's credibility. And forget whatever progressive discipline system might govern the traditional punishment of police misconduct: a prosecutor can put an officer on the *Brady* list for a small, first-time offense and leave her there for life without giving her any chance to clear her name.

Jonathan Abel, *Brady's Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team*, 67 Stan. L. Rev. 743, 780-82 (Apr. 2015) (footnotes omitted).

In *Duchesne v. Hillsborough County Attorney*, 119 A.3d 188 (N.H. 2015), police officers who successfully challenged the discipline imposed after they

25

were accused of unnecessary use of force brought an action against the Hillsborough County Attorney (prosecutor), seeking among other things, the removal of their names from the county's list of officers whose personnel files contained potentially exculpatory evidence required to be disclosed pursuant to *New Hampshire v. Laurie*, 653 A.2d 549 (N.H. 1995).[19] The officers argued that the prosecutor's refusal to remove them from the *Laurie* List violated their constitutional rights to due process of law. They argued that placement on the *Laurie* List affected a significant constitutional liberty and property interest because a *Laurie* designation could tarnish their reputations and damage their careers. The prosecutor conceded that the *Laurie* List was "a kind of death list" for the officers on it.

The trial court denied the officers relief. On appeal, the officers argued *inter alia*, that the allegations of excessive use of force were determined to be unfounded, and, therefore, inclusion of their names on the *Laurie* List or disclosure of their names to a court or a defendant in a future criminal case was unwarranted.

Given that the original allegations of excessive force were determined to be unfounded, the Supreme Court of New Hampshire (*Duchesne* Court) agreed and held that the trial court erred in not ordering the removal of officers from the "*Laurie* List" because there was "no sustained basis for the [officers'] placement on the '*Laurie* List.'" *Duchesne*, 119 A.3d at 198. Recognizing that the inclusion on

---

[19] In *Laurie*, the State knowingly withheld pre-employment and personnel files detailing numerous instances of conduct that reflected negatively upon the character and credibility of a Franklin Police Department detective who was a key prosecution witness. 653 A.2d at 549. Finding that the detective's testimony "went directly to the issue of the defendant's guilt," and noting that the undisclosed evidence could have been used to impeach that testimony, the Supreme Court of New Hampshire held that the defendant was denied due process of law and remanded the matter to the superior court for a new trial. Pursuant to *Laurie*, prosecutors in New Hampshire created a so-called "*Laurie* List," which is a list, in the form of an Excel spreadsheet, of police officers with potentially exculpatory information in their personnel files or elsewhere. *Duchesne*, 119 A.3d at 194.

the *Laurie* List carries a stigma, the *Duchesne* Court held that basic notions of fairness require that an officer must be removed from the list when it is clear that there are no valid grounds for his being on the list, and that, absent other available procedures, the courts can provide a remedy to an aggrieved officer. *Id.*

Although *Duchesne* is a New Hampshire case,[20] we find the case instructive. Here, as in *Duchesne*, the complaint averred that the allegations against the appellant police officers were determined to be ***unfounded***. They claim that because they were exonerated, there are no proper grounds for the DA's inclusion of their names on the Do Not Call List. We agree and find that the interests of the appellant police officers in their reputations and careers is such that there must be some post-placement mechanism available for an officer to seek removal from the Do Not Call List if the grounds for placement on the List are thereafter shown to be lacking in substance, as was the case in *Duchesne*.

Unlike the trial court, we do not agree that the complaint establishes that appellant police officers were afforded sufficient due process because the Letters informed them of the District Attorney's disclosure obligations "ahead of any hypothetical disclosure" and invited them to communicate in writing if they believed the information in the Letter was "incorrect." (Trial ct. op., 11/18/19, at 7.)

---

[20] In response to *Laurie*, the New Hampshire legislature enacted a statute, N.H. Rev. Stat. Ann. (RSA) §105:13-b, which was designed to balance the rights of criminal defendants against the countervailing interests of the police officers and the public in the confidentiality of officer personnel records. Where uncertainty exists as to whether information is exculpatory, RSA section 105:13-b directs that the evidence at issue be submitted to the court for an *in camera* review.

Inasmuch as RSA section 105:13-b was not directly at issue in *Duchesne*, we do not believe that the case is distinguishable on the grounds that Pennsylvania does not have an equivalent statute. As explained, the basic underpinning of the case was grounded on notions of fairness, which, in the *Duchesne* Court's view, required giving the officers an opportunity to demonstrate why they should not be on the *Laurie* List. This holding was not dependent on RSA section 105:13-b.

27

We disagree with the trial court's view that the Letters "serve[d] as protection of the officers' due process rights." *Id.*

First, whether the information in the Letter is "correct" does not go to whether the officers were mistakenly placed on the List and should be removed from the List in light of their exoneration. The Letters acknowledge that the officers were cleared of wrongdoing. Limiting the officers' challenge to whether the information is "correct" or not – is not the same as affording them the opportunity to establish before an impartial tribunal why, having been cleared, they should not have been placed on, and should not remain on, a List of untrustworthy officers. Therefore, the procedure offered by the District Attorney's Office, which restricts any challenge to the "correctness" of the information contained in the Letters, does not serve as meaningful opportunity to be heard on the issue. Moreover, adequate due process requires an *impartial* tribunal. As alleged in the complaint, the process offered by the Letters places sole discretion with the District Attorney regarding whether officers should be placed on or remain on the Do Not Call List even though they were acquitted. Therefore, it is not an adequate remedy to leave the decision to the very person whom the appellant police officers contend mistakenly and unfairly placed them on the List in the first place.

Applying the above principles to the instant case, we conclude that the complaint alleges sufficient facts, which must be taken as true at this stage of the proceeding, to state a claim for violation of the appellant police officers' fundamental right to protect their reputations without affording them due process. Accordingly, we find that the trial court erred by categorically concluding on POs that the appellant police officers are not entitled to prior notice that they are being considered for placement on the updated Do Not Call List or afforded a timely and

meaningful opportunity to be heard concerning whether they should be placed on the List.[21]

### Does the Doctrine of Absolute Immunity Bar the Due Process Claims Against the District Attorney?

Next, we address whether the trial court erred in sustaining the District Attorney's POs and dismissing the complaint based on the doctrine of absolute immunity. Citing *Miller v. Nelson*, 768 A.2d 858, 861 (Pa. Super. 2001), the trial court held that the district attorney "enjoys absolute immunity from liability for civil damages for actions related to prosecution of a criminal case." (Trial ct. op., 11/18/19, at 7-8.)

Although the trial court is correct that prosecutors are immune from lawsuits challenging their official conduct,[22] the complaint here seeks declaratory

---

[21] We wholly agree with the Dissent that "the District Attorney has an unshakable responsibility under the Fourteenth Amendment's Due Process Clause to disclose potentially material evidence to criminal defendants." *Fraternal Order of Police, Lodge No. 5 v. The City of Philadelphia*, ___ A.3d ___, ___ (Pa. Cmwlth. 1295 C.D. 2019, filed ____ (Ceisler, J., dissenting), slip op. at 2 (emphasis removed). Having said this and not in any way diminishing this absolute obligation, we are focused here on a ***Do Not Call List*** that was created by the District Attorney which, as we have explained, will likely result in an unfavorable and negative public perception of officers who are placed on that List. In such case, we are also cognizant of the crucial right of all citizens in America to be presumed innocent until proven guilty and the right to due process in the proceedings. The Court applies both constitutional precepts in their fullness and under the specific circumstances of this case. Specifically, the District Attorney continues to be bound to turn over exculpatory evidence while at the same time giving officers who have been accused and either not found guilty or exonerated of such claim their due process.

[22] *See Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976); *Durham v. McElynn*, 772 A.2d 68 (Pa. 2001) (holding that district attorneys enjoy high public official immunity and qualified immunity from all civil suits for damages); *In re Dwyer*, 406 A.2d 1355, 1359 (Pa. 1979) ("The public interest requires that district attorneys be able to carry out their duties without being hampered by civil suits claiming damages for actions taken in their official capacities."); *Mosley v. Observer Publishing Company*, 619 A.2d 343 (Pa. Super. 1993) (granting preliminary objections because the district attorney was immune from defamation suit as a high public official); *McCormick v. Specter*, 275 A.2d 688 (Pa. Super. 1971) (finding the district attorney was immune

**(Footnote continued on next page…)**

and injunctive relief to enjoin an alleged constitutional due process violation. Appellant police officers contend that they were not provided constitutional due process before being placed on the Do Not Call List. That is, they seek to **restrain** the District Attorney from publicizing the List **unless and until** they are provided with an opportunity to demonstrate why they should not be on the List. In *Fawber v. Cohen*, 532 A.2d 429 (Pa. 1987), our Supreme Court explained that governmental immunity cannot shield these types of claims, which simply seek to restrain state officials from performing affirmative acts, as follows:

> The distinction is clear between suits against the Commonwealth which are within the rule of its immunity and suits to restrain officers of the Commonwealth from enforcing the provisions of a statute claimed to be unconstitutional. Suits which seek to compel *affirmative action on the part of state officials or to obtain money damages or to recover property from the Commonwealth* are within the rule of immunity; suits which simply seek to *restrain state officials* from performing affirmative acts are not within the rule of immunity.

*Id.* at 433-34 (emphasis in original). *See also Wilkinsburg Police Officers Association v. Commonwealth*, 636 A.2d 134, 137 (Pa. 1993) (holding that lawsuits that seek to compel affirmative action on the part of state officials or to obtain money damages or to recover property from the Commonwealth are within the rule of immunity; suits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity); *R.H.S. v. Allegheny County Department of Human Services, Office of Mental Health*, 936 A.2d 1218, 1228 (Pa.

---

from libel and slander claims as a high public official when acting within his official duties). *See also Miller v. Nelson*, the case upon which the trial court relied, where we held that the district attorney had absolute immunity from the plaintiff's claims arising from his decision not to prosecute a private complaint.

30

Cmwlth. 2007) (holding that, notwithstanding governmental immunity, "[c]laims arising from violations of the Pennsylvania Constitution may still be raised against local governments").

Here, Appellants do not seek damages, nor do they seek to compel the District Attorney to perform an affirmative act. Rather, they seek constitutional compliance through equitable relief. Accordingly, the trial court incorrectly concluded that absolute immunity poses a bar to Counts I and II, insofar as Appellants seek injunctive relief to enjoin the DA from distributing the Do Not Call List unless, and until, they are provided with due process and have had an opportunity to challenge the placement of their names on the Do Not Call List. Because these counts seek a declaration that their right to protect their reputations was denied without due process, immunity poses no bar to appellant police officers' claims.

**Did the Trial Court Err in Dismissing the Complaint on the Grounds that Harms Allegedly Suffered by Appellant Police Officers are "Hypothetical" and "Speculative" in Nature?**

The trial court dismissed the complaint based on its conclusion that "the [complaint] was speculative and hypothetical in nature because no action has yet been taken that would infringe upon [appellant police officers'] rights." (Trial ct. op., 11/18/19, at 7.) We find no merit in the trial court's conclusion that the complaint should be dismissed on these grounds.

As explained, Appellants have asserted that a fundamental right is at stake, and the City and the District Attorney did not afford the appellant police officers the proper due process required under the Pennsylvania Constitution. In *Pennsylvania Bar Association*, the Insurance Department argued that the PBA failed to show any harm resulting to its members from their inclusion on an index of

attorneys suspected of fraud. To reiterate, the attorneys in that case complained that inclusion on the index would cause injury to their reputations. We held that their inclusion on the index would "inevitably lead[] to the injury of these attorneys' reputations, based upon suspicion alone." 607 A.2d at 854. We further observed that allowing attorneys to seek expungement after-the-fact was inadequate, explaining that "[t]he Supreme Court of the United States has recognized that notice is the most basic requirement of due process. Notice is necessary both to inform the interested parties of the pending action and to provide an opportunity to present objections." *Id.* at 856. We reasoned that by the time the listing was brought to the attorney's attention, the damage to him/her may have already been done, and he/she may have lost the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* at 857.

The same rationale applies here. The appellant police officers should not be required to wait until damage to their reputations has been done before they are provided a meaningful opportunity to be heard. As in *Pennsylvania Bar Association*, the negative stigma of being included on a Do Not Call List is a threat to the appellant police officers' reputations. *See also Wolfe v. Beal*, 384 A.2d 1187, 1189 (Pa. 1978) (holding that existence of government records containing information that might subject a party to negative stigmatization is a "threat" to that party's reputation).

Furthermore, contrary to the trial court's ruling, Appellants have alleged facts to establish that actual harm has already occurred as the result of placing the appellant police officers on the Do Not Call List. In Paragraphs 90 and 93 of the complaint, Appellants allege:

> 90. On [June 22, 2018, FOP] learned that some of its bargaining unit employees were informed orally and

32

without advance notice that their job duties were being restricted based on the prior "Do Not Call List" of former District Attorney Williams.

\*\*\*

93. On June 28, 2018, [FOP's President] sent a letter to [the Police Commissioner] informing him that bargaining unit employees had their work duties restricted by the PPD consequent to being placed on the new, updated and revised "Do Not Call List."

(Complaint, ¶¶90, 93, R.R. at 24a.)

In Paragraph 180 of the complaint, Appellants allege that one of the appellant police officers who was placed on the new Do Not Call List "was removed from his new assignment and was returned to a position as a patrol officer, resulting in a loss of overtime income and the potential of other career promotions." *Id.* ¶108, R.R. at 41a. Again, because this matter was before the trial court on POs, the trial court was required to assume these allegations are true. *Borough of White Oak v. Department of Transportation*, 360 A.2d 825, 826 (Pa. Cmwlth. 1976).

In this case, we cannot know that the harm alleged is theoretical or speculative until there is discovery, and the determination is made by a factfinder based on substantial evidence. For now, at this stage in the proceedings, we find that appellant police officers' contention that they were denied an opportunity to challenge their placement on the Do Not Call List to establish a procedural due process violation under the Pennsylvania Constitution, and, therefore, the trial court wrongly concluded that appellant police officers have suffered no harm.

Thus, the trial court erred in sustaining the POs and dismissing the complaint on the grounds that the harm alleged was hypothetical or speculative.

## IV. Conclusion

Based on the foregoing, we conclude that the trial court erred by categorically concluding on POs that the appellant police officers are not entitled to

prior notice that they are being considered for placement on the updated Do Not Call List or afforded a timely and meaningful opportunity to be heard concerning whether they should be removed from the Do Not Call List. We find Counts I and II of the complaint state cognizable constitutional due process claims and must be allowed to proceed. **In so doing, we emphasize that the DA's obligations under *Brady* and *Giglio* are not contingent upon whether a police officer is placed on the Do Not Call List. As we have made clear, the DA may provide information about any police officer to criminal defense counsel regardless of whether that officer is on the Do Not Call List. Thus, the due process we have found is owed to exonerated police officers should not in any way interfere with the timeliness or conduct of the criminal trial.**

Accordingly, the trial court's dismissal of the complaint is affirmed, in part, and vacated, in part. To the extent that the trial court dismissed Appellants' requests to enjoin the DA and the City from carrying out their functions under *Brady* and *Giglio*, that portion of the trial court's decision to dismiss the complaint is affirmed. The trial court's dismissal of the due process claims raised in Counts I and II is vacated.

_____
PATRICIA A. McCULLOUGH, Judge

34

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fraternal Order of Police Lodge No. 5, by its guardians ad litem, John McNesby, President; Roosevelt Len Poplar, Vice President; John McGrody, Vice President; Steve Weiler, Vice President; Nicholas Denofa, Vice President; Police Officer Sean Cahill; Detective Michael DeRose; Police Officer Richard Green; Police Officer Constance Harris; Police Officer Matthew Nodiff; and Police Officer Anthony Roselli,

Appellants

v.

The City of Philadelphia, its Officials, Agents, Employees and Assigns; Jim Kenney, in his official capacity as Mayor of the City of Philadelphia; Larry Krasner, in his official capacity as District Attorney of the City of Philadelphia; R. Richard Ross Jr., in his former capacity as Police Commissioner of the City of Philadelphia

: No. 1295 C.D. 2019

## ***ORDER***

AND NOW, this 9th day of November, 2021, the August 21, 2019 orders of the Court of Common Pleas of Philadelphia County (trial court) dismissing Appellants' Second Amended Complaint is hereby affirmed in part and vacated in part as follows:

1. To the extent that the trial court dismissed Appellants' requests to enjoin Appellees from carrying out their functions under *Brady v. Maryland*, 373

U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), that portion of the trial court's decision to dismiss the complaint is AFFIRMED.

2. The trial court's dismissal of Appellants' due process claims raised in Counts I and II is VACATED and the matter is remanded for further proceedings consistent with this opinion.

Jurisdiction is relinquished.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fraternal Order of Police Lodge No. 5, : 
by its guardians ad litem, John : 
McNesby, President; Roosevelt Len : 
Poplar, Vice President; John McGrody, : 
Vice President; Steve Weiler, Vice : 
President; Nicholas Denofa, Vice : 
President; Police Officer Sean Cahill; : 
Detective Michael DeRose; Police : 
Officer Richard Green; Police Officer : 
Constance Harris; Police Officer : 
Matthew Nodiff; and Police Officer : 
Anthony Roselli, : 
                Appellants : 
                                : 
        v. :   No. 1295 C.D. 2019
                                :   ARGUED: June 11, 2020
The City of Philadelphia, its Officials, : 
Agents, Employees and Assigns; Jim : 
Kenney, in his official capacity as : 
Mayor of the City of Philadelphia; Larry : 
Krasner, in his official capacity as : 
District Attorney of the City of : 
Philadelphia; R. Richard Ross Jr., in his : 
former capacity as Police Commissioner : 
of the City of Philadelphia : 

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge

CONCURRING AND DISSENTING OPINION
BY JUDGE CEISLER                        FILED: November 9, 2021

I concur in part and dissent in part from the majority's treatment of the Trial Court's August 22, 2019 orders, as it is readily apparent that the Court of Common Pleas of Philadelphia County (Trial Court) properly dismissed The Fraternal Order of Police Lodge No. 5, by its guardians *ad litem*, John McNesby, President; Roosevelt Len Poplar, Vice President; John McGrody, Vice President; Steve Weiler, Vice President; Nicholas Denofa, Vice President; Police Officer Sean Cahill; Detective Michael DeRose; Police Officer Richard Green; Police Officer Constance Harris; Police Officer Matthew Nodiff; and Police Officer Anthony Roselli's (collectively, Appellants) Second Amended Complaint,[1] due to the respective informational disclosure obligations of the City of Philadelphia, its Officials, Agents, Employees and Assigns; Jim Kenney, in his official capacity as Mayor of the City of Philadelphia; and R. Richard Ross, Jr., in his official capacity as Police Commissioner of the City of Philadelphia[2] (collectively, City), and Larry Krasner, in his official capacity as District Attorney of the City of Philadelphia (District Attorney), to criminal defendants under the Fourteenth Amendment of the United

---

[1] Police Officer Thomas Fitzpatrick, Sergeant Jason Reed, Police Officer Joseph Reilly, Sergeant Timothy Stephan, and Police Officer Andrew Yaletsko were named as appellants in the amended notice of appeal that was filed on October 9, 2019, but this matter's caption has not been updated to reflect that fact.

[2] Commissioner Ross resigned from his position effective August 20, 2019, and was replaced by Danielle Outlaw, who assumed her role as Philadelphia Police Department (PPD) Commissioner on February 10, 2020. *See The Philadelphia Inquirer*, "Philadelphia Police Commissioner Richard Ross resigns after woman alleges affair, retribution," https://www.inquirer.com/news/richard-ross-resigns-philadelphia-police-commissioner-gender-racial-sexual-harassment-20190820.html (last accessed November 8, 2021); *The Philadelphia Inquirer*, "New Philly Police Commissioner Danielle Outlaw takes over her new department," https://www.inquirer.com/news/philadelphia-police-commissioner-danielle-outlaw-first-day-20200210.html (last accessed November 8, 2021).

States Constitution.[3] I come to this conclusion in light of the fact that this solemn duty, which is critical to ensuring that justice is fairly and accurately dispensed, vitiates whatever claims rooted in Pennsylvania law that Appellants may have otherwise been able to pursue.[4]

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and the case law which has sprung forth from that seminal decision, the District Attorney has an *unshakable responsibility* under the Fourteenth Amendment's Due Process Clause to disclose potentially material evidence to criminal defendants. To that end, the United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

_____

[3] Regarding due process, the Fourteenth Amendment reads, in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, §1.

[4] Per the Supremacy Clause, "[the United States] Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

> It is fundamental that by virtue of the Supremacy Clause, the State courts are bound by the decisions of the Supreme Court with respect to the federal Constitution and federal law, and must adhere to extant Supreme Court jurisprudence. U.S. CONST. art. VI, cl. 2;[] *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 221 . . . (1931) ("The determination by this [C]ourt of [a federal] question is binding upon the state courts, and must be followed, any state law, decision, or rule to the contrary notwithstanding."); *Com*[.] *v. Ware*, . . . 284 A.2d 700, 702 ([Pa.] 1971) ("[A] state court is not free to ignore the dictates of the United States Supreme Court on federal constitutional matters because of its own conclusion that those dictates are 'ill-considered.'").

*Council 13, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO ex rel. Fillman v. Rendell*, 986 A.2d 63, 77-78 (Pa. 2009) (internal footnote omitted).

prosecution." *Brady*, 373 U.S. at 87. "[R]egardless of [whether a criminal defendant requests specific information], favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality opinion of Blackmun, J.)) and citing *id.* at 685 (White, J., concurring in part and concurring in judgment).

"When the '**reliability** of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)) (emphasis added).

> [**T**]**he prosecution,** *which alone can know what is undisclosed***, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached**. This in turn means that *the individual prosecutor has a <u>duty to learn</u> of any favorable evidence known to the others acting on the government's behalf in the case, <u>including the police</u>*. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S. at 87 . . .), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.
>
> . . . .
>
> [**T**]**he prosecution cannot be subject to any disclosure obligation without at some point having the responsibility to determine when it must act. Indeed, even if due process [was] thought to be violated by every failure to disclose an item of exculpatory or impeachment evidence (leaving harmless error as the government's only fallback), the prosecutor would still**

**be forced to make judgment calls about what would count as favorable evidence, owing to the very fact that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record.**

. . . .

Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result.

***This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence.***

*Kyles*, 514 U.S. at 437-39 (emphasis added); *accord United States v. Agurs*, 427 U.S. 97, 108 (1995) ("Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure."). In short, the District Attorney has an affirmative duty to seek out potentially exculpatory evidence, as well as evidence that could be used to impeach prosecution witnesses, whether that evidence is in the possession of the Office of the District Attorney or the City itself, and must provide that evidence to the accused. Furthermore, the City has a derivative duty to assist the District Attorney with fulfilling his constitutional obligation to criminal defendants, by providing the District Attorney, at his request, with information regarding such allegations. *Kyles*, 514 U.S. at 437-39. The majority and I are thus in agreement that there is no legal basis for enjoining the City from providing requested information to the District Attorney, or enjoining the District Attorney from either establishing a

so-called "Do Not Call List" or disclosing officer misconduct-related information to line prosecutors.[5]

It is at this juncture that I part company with the majority opinion. First and foremost, I agree with the District Attorney, and the Trial Court, that information regarding a PPD employee's alleged perpetration of misconduct may certainly be material in some instances, *even if the allegation has previously been deemed by others to have been unfounded*. This is because such an accusation goes to the heart of a PPD employee's trustworthiness and speaks to whether they have conducted themselves with fidelity and honor in fulfilling the inherently weighty duties of their job. *Giglio*, 405 U.S. at 154; *cf. Com. v. Mejia-Arias*, 734 A.2d 870, 876 (Pa. Super. 1999) (quoting *Com. v. Herrick*, 660 A.2d 51, 61 (Pa. Super. 1995)) (a police officer's personnel file is, at most, protected by "a common law privilege" which "[']must yield to the constitutional rights of a criminal defendant'"). Therefore, in order to avoid running afoul of the Fourteenth Amendment's Due Process Clause, the District Attorney must exercise his broad discretion and err on the side of disclosure when faced with the question of whether a misconduct allegation is material, *even when that allegation was not ultimately sustained or did not result in the implicated PPD employee being punished*.[6]

---

[5] I also agree with the majority that the Trial Court erred by dismissing the Second Amended Complaint on the bases that the District Attorney was protected by absolute immunity and because Appellants failed to provide proof that the Do Not Call List exists. Neither of these points affect the outcome here, because, as discussed *infra*, the Trial Court correctly determined that there were other bases for dismissing the Second Amended Complaint in full.

[6] I note, without additional comment, that the PPD recently released a study of its disciplinary process that was coauthored by the City's Police Advisory Commission, in which it was stated that

> out of all [misconduct] allegations [against PPD employees] between 2015 and 2020, 86% of the allegations did not advance

**(Footnote continued on next page…)**

Appellants do not challenge the District Attorney's broad constitutional responsibilities and admit "that under *Brady*[,] . . . [the District Attorney] is obligated to provide exculpatory information to criminal defendants concerning the nature of the criminal investigation that resulted in criminal charges as well as information that could impeach a police officer who participated in the criminal investigation of that defendant." Appellants' Br. at 30. Instead, it seems that Appellants' concerns are essentially reducible to two general points: first, they object to not having a say regarding what information the District Attorney elects to disclose to criminal defendants about the aforementioned misconduct allegations; and second, they fear that disclosing this information will harm PPD employees' careers. *See id.* at 41-54.

With regard to the first issue, Appellants run headlong into the District Attorney's constitutional duty to affirmatively seek out potentially exculpatory and impeachment evidence, as well as his responsibility to err on the side of disclosure when faced with evidence of uncertain materiality.

> Affording police officers authority . . . that prevent[s] the district attorney from carrying out his duties would present a clear infringement of powers which the constitution and the legislature, as well as our case law, have reposed in the district attorney. Not only would it shift power from an elected and publicly accountable official to appointed public servants, but it would create havoc in the administration of justice by creating unbridled and

---

beyond the initial investigation, and when [the] Internal Affairs [Division] did find evidence of misconduct, most complaints (76%) resulted in only training and counseling—which is not considered discipline. Additionally, penalties for guilty officers were typically minimal: all in all, only 0.5% of civilian allegations resulted in any recorded consequence beyond a reprimand.

Police Advisory Commission and PPD, *Collaborative Review and Reform of the PPD Police Board of Inquiry - Policy, Practice, and Custom Report* (May 20, 2021), at 2, *available at* https://www.phila.gov/media/20210521150500/Collaborative-Review-and-Reform-of-the-PPD-Police-Board-of-Inquiry.pdf (last accessed November 8, 2021).

> decentralized decisions [regarding the handling of criminal cases].

*Com. v. Stipetich*, 652 A.2d 1294, 1295 (Pa. 1995). Simply put, Appellants cannot be permitted to interfere with or block the District Attorney's discretionary authority to determine what constitutes material or potentially material evidence, nor with his concomitant duty to disclose that evidence to criminal defendants, as doing so would inevitably force the District Attorney to violate criminal defendants' due process rights. Similarly, allowing Appellants to invade the District Attorney's discretionary realm would cause the City to commit due process violations as well, since Appellants would then be able to prevent the City from disclosing requested information to the District Attorney and, by extension, to criminal defendants.

Given this, Appellants' procedural concerns cannot, as the majority argues, be disentangled from the District Attorney's Fourteenth Amendment-based disclosure obligations. *See Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, __ A.3d __, __ (Pa. Cmwlth., No. 1295 C.D. 2019, filed November 9, 2021 (*FOP*), slip op. at 19-28. To reiterate, allowing police officers to interject themselves into the District Attorney's *Brady* information disclosure decisions, in the manner sought by Appellants and sanctioned by the majority, would run counter to Pennsylvania Supreme Court case law and inevitably lead to violations of criminal defendants' due process rights. Such an outcome, for reasons legal, practical, and moral, would be utterly unacceptable.[7]

The majority seeks to counter this by invoking the concept of "innocent until proven guilty" and argues, in essence, that PPD employees who have been

---

[7] Moreover, and independent of due process considerations, the Pennsylvania Constitution *does not* protect the contents of police officers' personnel files from disclosure to the general public. *Mejia-Arias*, 734 A.2d at 876. Consequently, neither the constitutional right to privacy nor the constitutional right to reputation act as an impediment to public dissemination of such information.

"exonerated of misconduct charges," as the majority puts it, must be given the opportunity to contest their placement on the District Attorney's Do Not Call List prior to disclosure of any misconduct-related information to outside parties. *See, e.g.*, *id.* at __, slip op. 17 n.15, 20, 27-28.[8] This argument is entirely without a basis in law, as the state's burden of proof in criminal matters is *completely irrelevant* to the question of whether the District Attorney may, or must, disclose information regarding misconduct allegations to criminal defendants.[9] The *correct* question is

---

[8] I take issue with the majority's characterization of how the misconduct allegations against the 11 PPD employees named in this matter's amended notice of appeal were resolved, as the reality is more complicated than suggested by the term "exonerated." As of the filing of the Second Amended Complaint, two of the PPD employees were under criminal investigation; one had been indicted in federal court and was subsequently found not guilty; one had the misconduct allegations against him substantiated by the PPD's Internal Affairs Division and was then found guilty by the PPD's Police Board of Inquiry on some of the misconduct charges; one had the misconduct allegations against him substantiated by the Internal Affairs Division, but the Police Board of Inquiry withdrew all of the charges for unspecified reasons; one had two distinct sets of misconduct allegations against him that were substantiated by the Internal Affairs Division, but the Police Board of Inquiry did not charge him in one instance, for unspecified reasons, and found him not guilty in the other; and five had the misconduct allegations against them substantiated by the Internal Affairs Division but were ultimately found not guilty by the Police Board of Inquiry. *See* Second Am. Compl., Exs. S, T, V, Z, BB-II.

[9] The majority vaguely references two cases, *Dicks v. United States*, (E.D. Pa. No. CR 03-266, filed Sept. 8, 2010), 2010 WL 11484356; and *United States v. Booker*, (E.D. Pa. No. CRIM. 95-211, filed Apr. 24, 1997), 1997 WL 214850, *aff'd*, 133 F.3d 911 (3d Cir. 1997)), which it effectively claims justify and support its theory that PPD employees' "innocence" can somehow operate as a limitation on the District Attorney's constitutionally mandated disclosure duties. *See* *FOP*, __ A.3d at __, slip op. at 17 n.15. The majority, however, misapprehends the particulars of those cases, as well as their relevance to this situation. Both *Booker* and *Dicks* dealt with post-conviction challenges where, at that stage in the proceedings, the government either contested or did not admit to the materiality of the evidence at issue in those matters, which pertained to allegations of officer misconduct and which the affected defendant sought to leverage for a new trial or a reduced sentence. *See Dicks*, 2010 WL 11484356, at *2-*3; *Booker*, 1997 WL 214850, at *1. Furthermore, those cases hinged, in large part, upon whether that evidence would have been admissible at trial, using a retrospective analysis to determine whether it would have been material to the accused's guilt or innocence and, thus, should have been disclosed per *Brady. See*
**(Footnote continued on next page…)**

not whether each PPD employee has been found, beyond a reasonable doubt, to have committed the misconduct of which they were accused; to state the obvious, the PPD employees are not the ones who will be on trial here. **Instead, the issue is whether the evidence regarding each alleged misconduct potentially implicates the PPD employees' reliability and credibility as witnesses in cases where their testimony is central to determining whether the *accused* are guilty beyond a reasonable doubt.** *Giglio*, 405 U.S. at 154.

It is important to note that, per the Second Amended Complaint and the exhibits attached thereto, each allegation of misconduct relevant to this matter was found sufficient *by the government itself*, such that each named PPD employee was thereafter subjected to potential sanction either by the PPD itself or a jury of their peers. Regardless of whether each named PPD employee was then found guilty and punished, either administratively or in a court of law, the government's threshold substantiation of the underlying accusations means that they were of a more serious, viable nature and did not merely consist of unfounded assertions put forth by members of the general public. This is not to say, however, that the District Attorney cannot or must not disclose information to criminal defendants regarding misconduct allegations that ultimately were not substantiated. Again, the salient question is whether those allegations are potentially material, not whether they resulted in punishment being levied against the accused individuals.

This is not to suggest that all such information will necessarily be *admissible* at trial in every situation. Determinations of that nature require a separate analysis,

---

*Dicks*, 2010 WL 11484356, at \*5-\*10; *Booker*, 1997 WL 214850, at \*1-\*4. By contrast, the District Attorney has already concluded here, prior to trial or conviction, that the misconduct-related evidence regarding the 11 named PPD employees is material in nature. *Booker* and *Dicks* are therefore inapposite, as the factual scenarios and procedural postures of those cases are entirely distinguishable from the one currently before us.

which will ultimately be made by the trial judge in each individual case, in line with the Pennsylvania Rules of Evidence. *Com. v. Hawk*, 709 A.2d 373, 376 (Pa. 1998) ("In determining the admissibility of evidence, the trial court must decide whether the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect."); *see, e.g.*, Pa. R.E. 404(a)(3) ("Evidence of a witness'[] character may be admitted under [Pennsylvania] Rules [of Evidence] 607, 608, and 609."); Pa. R.E. 607 (allowing impeachment of a witness' credibility); Pa. R.E. 608 (governing admissibility of evidence regarding a witness' reputation for, and past history of, truthfulness or lack thereof); Pa. R.E. 609 (allowing a witness' credibility to be impeached in certain instances with evidence of criminal conviction(s)). However, given the unmistakably clear directives contained in *Agurs*, *Brady*, *Giglio*, *Kyles*, and other, similar cases, a prosecutor *cannot* put the cart before the horse by using prospective skepticism about admissibility to drive their decisions about what evidence must be disclosed to each defendant. *See Com. v. Green*, 640 A.2d 1242, 1246 (Pa. 1994) ("[I]t is clear that the holding in *Brady* . . . in no way mandates that the evidence first be admissible before it can be deemed 'material' to the defense."); *cf. Com. v. Santiago,* 654 A.2d 1062, 1068 (Pa. Super. 1994) (quoting *U.S. v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985)) ("'*Brady* is not a discovery rule, but a rule of fairness and *minimum* prosecutorial obligation.'").

As for Appellants' second issue, their theoretical concerns about the potential future impact of disclosure upon PPD employees' careers cannot, by law, serve as a basis for granting them declaratory or injunctive relief. "Although the Declaratory Judgments Act[10] is to be liberally construed, one limitation on a court's ability to issue a declaratory judgment is that the issues involved must be ripe for judicial

---

[10] 42 Pa. C.S. §§ 7531-7541.

determination, meaning that there must be the presence of an actual case or controversy." *Pa. State Lodge v. Dep't of Lab. & Indus.*, 692 A.2d 609, 613 (Pa. Cmwlth. 1997), *aff'd*, 707 A.2d 1129 (Pa. 1998). "A declaratory judgment must not be employed to determine rights in anticipation of events which may never occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic." *Gulnac by Gulnac v. S. Butler Cnty. Sch. Dist.*, 587 A.2d 699, 701 (Pa. 1991). With the exception of Officer Reilly, who claims that he was transferred to a less desirable position within the PPD after receiving the aforementioned letter,[11] *none* of Appellants point to any *actual* harm in their Second Amended Complaint that has been visited upon them as a result of the District Attorney and the City's actual or anticipated actions.

I also note that Appellants fail to identify any specific instances where the District Attorney has prevented them from testifying at trial. However, this is more of an academic point, as PPD employees do not have a constitutional, statutory, or common law right to force the District Attorney or his subordinates to call them as trial witnesses. It is well settled that a prosecutor has "no duty . . . to call witnesses whose names appear on a bill of indictment or even eye witnesses, if [he] believes after examination or investigation that their testimony is unreliable, or unworthy of belief, or surplusage or irrelevant." *Com. v. Horn*, 150 A.2d 872, 874 (Pa. 1959).

> [T]he prosecuting officer is so far bound to a judicial attitude that he should present to the jury substantially all the evidence within his reach that may throw important light on the case. This, however, does not mean that he must call as a witness everybody that anybody else may think desirable. The responsibility is upon him, and a large measure of discretion must be allowed him in meeting it.

---

[11] *See* Second Am. Compl., ¶¶179-80.

*Com. v. Karamarkovic*, 67 A. 650, 651 (Pa. 1907). Ultimately, the District Attorney and his subordinates are responsible for serving the interests of ***justice*** and cannot be forced to prosecute cases in a manner which they believe will fail to deliver a righteous outcome for both the accused perpetrators, and the victims, of criminal acts. *See Com. v. Giacobbe*, 19 A.2d 71, 75 (Pa. 1941) ("[T]he district attorney is a quasi[-]judicial officer and as such should be motivated by a desire to accomplish justice rather than by an inordinate zeal to obtain convictions[.]").

Furthermore, Appellants do not allege in their Second Amended Complaint that the District Attorney has operated in bad faith to prevent specific PPD employees from offering witness testimony. It is thus immaterial whether the Do Not Call List actually exists, due to the District Attorney's broad purview to identify PPD employees whose work histories could significantly undermine their credibility and trustworthiness, and thus their viability as witnesses at trial, for such reasons as internal affairs complaints and investigations, disciplinary actions, excessive force incidents, or civil rights lawsuits. *Cf. Com. v. Michaliga*, 947 A.2d 786, 795 (Pa. Super. 2008) ("[I]t is presumed that the district attorney act[s] in good faith[.]"). To that point, Appellants themselves admit that their "causes of action in no way attempt to stop . . . the creation of a 'Do Not Call List,' but rather seek to prevent disclosures of personnel information not required by [*Brady* and its progeny] without first protecting [Appellants'] constitutional, statutory, and common law rights[.]" Appellants' Br. at 31. Thus, even if the aforementioned reasons why Appellants' suit is legally untenable could be ignored, it remains that the overwhelming balance of

them would be without a legal basis for obtaining their desired relief at this juncture.[12]

Accordingly, I would affirm the Trial Court's dismissal, via its August 22, 2019 orders, of Appellants' Second Amended Complaint and firmly dissent from the majority's conclusion that Appellants have a constitutional right to interject themselves in any way into the District Attorney's *Brady* information disclosure process, as well as from the majority's determination that those orders should be

---

[12] Appellants may certainly avail themselves of the rights afforded to them through their collective bargaining agreement with the City, should their concerns about career impacts, like Officer Reilly's, shift from abstract to concrete. That is their right under the Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1-217.12, otherwise known as "Act 111" or the "Policemen and Firemen Collective Bargaining Act," which governs police officers' collective bargaining rights in Pennsylvania. However, it is unclear whether a PPD employee could present a viable collective bargaining grievance in response to PPD employment decisions that resulted, to some degree, from the City's performance of constitutionally mandated duties.

partially vacated and that this matter should be remanded to the Trial Court for additional proceedings.[13]

_____

ELLEN CEISLER, Judge

Judge Wojcik joins in the Concurring and Dissenting Opinion.

---

[13] The majority does not address Appellants' claim that is based upon the Right-to-Know Law (RTKL), Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104, but I elect to do so, in order to explain why it is entirely without merit. Appellants' interpretation of the RTKL would deem that law the sole mechanism for *anyone* to obtain information from state or local government, turning the RTKL into a cudgel used to prevent transparency, rather than recognizing that it is not the only way for securing such information. *See, e.g.*, *Elliott v. Unemployment Comp. Bd. of Rev.*, 474 A.2d 735, 738 (Pa. Cmwlth. 1984) (holding that the RTKL's predecessor, The Right to Know Act, Act of June 21, 1957, P.L. 390, *as amended*, *formerly* 65 P.S. §§ 66.1-66.9, *repealed by* Section 3102(2)(ii) of the RTKL, Act of February 14, 2008, P.L. 6, 65 P.S. § 67.3102(2)(ii), did not apply where a governmental agency voluntarily disclosed information). In a sense, this would also run counter to the purpose animating the RTKL, "which is designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *Pa. State Police v. McGill*, 83 A.3d 476, 479 (Pa. Cmwlth. 2014). Moreover, applying the RTKL to intergovernmental transfers of information would seriously diminish governmental efficiency, as any such transfer would needlessly have to go through another layer of review before it could be approved. That would certainly make prosecutions much more cumbersome, as the prosecuting attorney would have to file RTKL requests with law enforcement agencies for every single piece of information pertaining to arrested individuals. This would undoubtedly create processing backlogs, resulting in downstream problems as far as holding people without charge and failing to try them in a timely manner.